## ATTACHMENT "A"

I, Jeffrey S. Baker, being duly sworn, depose and state that:

1. I am a Special Agent with the Bureau of Alcohol Tobacco Firearms and Explosives, U.S. Department of Justice, and have been so employed since July of 1999. Currently, I am assigned to the Ashland, Kentucky Field Office. I am a graduate of the Federal Law Enforcement Training Center and the Bureau of ATF National Academy. Prior to my employment with ATF, I was employed as a Trooper and Detective with the Kentucky State Police for approximately five years. As a Detective with the Kentucky State Police I operated in an undercover capacity for the purpose of investigating drug traffickers.

2. On August 18, 2006, the Perry County, KY 911 center received a call at 11:40pm to report that three armed subjects posing as police officers from Operation UNITE robbed Pauline Tracy, Carew Messer, Louise Williams, and Williams' juvenile daughter at Pauline Tracy's residence located at 216 Thomas Lane, Viper, Perry County, KY and that they took medication and a shotgun. The caller, Louise Williams (Pauline Tracy's adult daughter), provided a suspect vehicle description.

3. On August 19, 2006, at 12:15am the Perry County, KY Sheriff's Department (PCSD) stopped a white 1991 GMC Blazer, KY License Plate number D7142, that fit the description of the suspect vehicle near Leatherwood, Perry County, KY. The vehicle was occupied by James Bowling and Jeremy Brashear and Bowling had an empty holster on his person. The vehicle was registered to James Bowling.

4. The PCSD detained the subjects and subsequently located a loaded Springfield Armory Champion Model .45 caliber pistol, serial number 71468, and a pill bottle that had a number written on the cap with black marker (the label was partially ripped off). The PCSD case report stated that they took digital photos of the suspect vehicle and met with Louise Williams nearby. The PCSD case report stated that Williams identified the vehicle in the digital photos as the vehicle used during the robbery and the pill bottle (described above) as her mother's. The PCSD case report stated that Williams advised that the pill bottle belonged to her mother, Pauline Tracy, and that her mother made the markings on the cap.

5. The PCSD arrested James Bowling and Jeremy Brashear and Mirandized both suspects. There were 11 suspected Oxycodone pills and 2 suspected Hydrocodone pills in the pill bottle described above. In addition, the PCSD also located a pair of green camouflage pants, a blue toboggan hat, a 20 gauge Remington shotgun shell, .223 caliber ammunition in a Wolf brand ammunition box, and a white box containing 20 additional rounds of .45 caliber ammunition (total of 34 rounds).

-2-

6. While Jeremy Brashear was in the back of a PCSD cruiser he attempted to hide 4 gold rings, a silver ring, and a small screw driver. Brashear admitted that he knew that the items were stolen, but that he did not know who the rightful owner was.

7. The Perry County 911 Center incident report (CAD Incident) generated as a result of the home invasion described above also had the following entry:

> "The clothing description of the subjects also matched the description of the other robberies in Leslie Co and Clay Co."

8. Jeremy Brashear and James Bowling have remained in custody since they were arrested by the Perry County Sheriff's Department.

9. On August 19, 2006 KSP Detective Chris Fugate and HIDTA Task Force Officer John Couch interviewed Jeremy Brashear. Brashear identified a number of individuals who participated in home invasions, including a man name George Clark, and advised that those individuals dressed as police officers and targeted suspected drug dealers. Brashear advised that they were armed with firearms during the home invasions. He advised that George Clark and James Bowling made drug buys from drug dealers, scoped out the residences, and then returned to rob the drug dealers.

10. Brashear advised that (just prior to when he was arrested) George Clark and another suspect, Josh Wilson, left in one vehicle with the police gear, firearms, and items stolen during the home invasion, while he and James Bowling followed them in a separate vehicle.

11. Brashear advised that he was last inside of George Clark's residence on August 17, 2006. He advised that he observed a handgun in Clark's kitchen on that date. Brashear advised that Clark hid police gear on the hill (behind the residence) and that Clark kept a lot of Rubbermaid containers around his yard.

12. Detective Fugate requested a criminal history query for George Clark and the query showed that Clark had been convicted of two counts of Robbery 1st degree and received a sentence of 10 years of incarceration.

13. On August 19, 2006, Detective Fugate obtained a state search warrant from Clay County, KY District Judge Oscar G. House for Clark's residence located in Leslie County, KY. Detective Fugate served the search warrant on August 19, 2006 and located a small amount of marijuana, numerous rounds of ammunition of various calibers, a green ammunition pouch, a gun cleaning kit, 2 camouflage turkey masks, 1 purple ski mask, an expandable rifle stock, a Woodland BDU shirt, and a Ranger Joe's military and law enforcement gear

-3-

catalog in the residence. They located an empty gray Tote container behind the residence.

14. On August 20, 2006, George Clark and his wife, Deidre Clark, were arrested by KSP for charges unrelated to this affidavit and George Clark has remained in custody since his arrest.

15. On August 21, 2006, the PCSD released the pill bottle described above to UNITE Law Enforcement Director Daniel Smoot. The label had been ripped off, but an RX number remained on a portion of the label. The RX number was used to confirm that the prescription bottle was for Endocet, that it was filled at the CVS Pharmacy in Hazard, KY, and that it belonged to Pauline Tracy.

16. On August 21, 2006, KSP retrieved James Bowling from the Perry County Regional Jail and brought him to the property located directly behind George Clark's residence located at 689 Garrison Hollow Road Stinnett, Leslie County, KY to meet with representatives from ATF and KSP in an attempt to locate the firearms that were used during home invasions. Bowling had previously stated that he had an idea where George Clark had hidden the firearms that they used during the home invasions and had agreed to cooperate with law enforcement. ATF and KSP were not able to locate the above mentioned firearms.

17. Bowling advised that he could place a phone call to a man who resided in the area named Dan Hoskins in an attempt to find out where the firearms that were used during the home invasions were hidden.

18. Bowling placed an undercover controlled recorded phone call to Dan Hoskins at (606)374-4353. Hoskins initially thought that Bowling was George Clark. Bowling stated that he needed his (Bowling's) gun, that Clark had taken off with his firearm, and that he had heard that Hoskins had picked Clark up.

19. Hoskins stated that he did not pick Clark up, but that he (Hoskins) was at Bowling's residence when Clark threw the firearm in his (Hoskins') car and asked him to bring the firearm to him in a little while. Hoskins advised that the only thing that Bowling could do was to talk to Clark about the firearm.

20. Hoskins advised that he met Clark on top of the mountain and that Clark loaded the firearm on his (Clark's) four wheeler and left in the direction of the top of the hill behind Clark's residence. Hoskins advised that he took Clark the firearm about an hour after he was at Bowling's residence.

21. Hoskins stated that Bowling's wife saw Clark put the firearms in the back of his (Hoskins') vehicle.

-4-

22. After completing the recorded call, James Bowling agreed to identify the residences that they had robbed on August 18, 2006. Bowling identified a trailer near Jeff, Perry County, KY that was determined to belong to Roger Cornett and a residence in Hardburly, Perry County, KY that was identified as belonging to Jerry Delaney.

23. Bowling directed officers to a cemetery on top of the hill on Pratt Mountain, which is located near Viper in Perry County, KY. He stated that was the place where they had met after they had robbed Carew Messer's residence. TFO John Couch located 4 prescription bottles that belonged to Pauline Tracy at this location.

24. On August 22, 2006, Detective Chris Fugate, Officer John Couch, and KSP Sgt. David Banks interviewed Jerry Delaney. Delaney stated that at approximately 10:00pm to 10:30pm (on August 18, 2006), two men entered his residence wearing black shirts with Police written on them. He stated that he stood up and one of the subjects struck him in the face with the butt of what appeared to be some type of machine gun. Delaney stated that he was struck on the left side of his face and received injury to his cheek. Photographs were taken of Delaney's face and abrasions and bruising were apparent.

25. Delaney stated that the suspects said that they were UNITE officers and that they had a search warrant for the residence. He stated that they put him down on the floor and one suspect held a rifle on him while the other subject was standing in the kitchen area. Delaney stated that the subject in the kitchen fired a round through the floor of the kitchen and told him that he better keep his head down. Officers located a spent .223 caliber shell casing in Delaney's residence and a bullet hole in the floor of the residence. Delaney stated that they took $100.00 dollars in cash from him. He stated that they asked him where he kept his drugs, but he told them that he didn't have any.

26. On August 20, 2006 and August 23, 2006, James Bowling was interviewed by KSP and on September 3, 2006 and January 11, 2007, I interviewed James Bowling. During the course of these interviews Bowling essentially confessed to participating in seven home invasions during which they posed as police officers and targeted suspected drug dealers. He advised that they conducted the home invasions in Perry County, Leslie County, Clay County, and Laurel County, all located in the Eastern District of Kentucky.

27. Bowling advised that the first home invasion that he had participated in was at a man named Kenneth Caldwell's residence in Leslie County, KY and that George Clark, Josh Wilson, and he participated in that robbery. He advised that George Clark, Jeremy Brashear, and he participated in the remaining six home invasions. Bowling identified an additional co-conspirator named Rick

-5-

Brashear. He advised that Rick Brashear identified drug dealers that they could rob.

28. Bowling advised that Clark has used an AR-15, a 20 gauge shotgun, and a .22 caliber rifle during the home invasions. Bowling advised that Jeremy Brashear had also used the 20 gauge shotgun and an AR-15 during the home invasions. Bowling advised that he used a .45 caliber handgun during the home invasions.

29. Bowling advised that they took a number of firearms during the Caldwell home invasion including a 20 gauge shotgun. Bowling advised that after the robbery Clark took the stolen firearms with him. Bowling advised that they used a sawed-off 20 gauge shotgun during one home invasion and that the sawed-off shotgun was the same 20 gauge shotgun that had been stolen from Kenneth Caldwell.

30. Bowling confirmed that George Clark fired a round during the home invasion at Jerry Delaney's residence. Bowling advised that George Clark told him that he had been in prison for committing home invasions.

31. In addition to the above described interview on August 19, 2006, Jeremy Brashear was interviewed on August 20, 2006, by KSP and on August 31, 2006 and January 11, 2007, I interviewed Jeremy Brashear. During the course of these interviews Brashear essentially confessed to participating in six home invasions during which they posed as police officers and targeted suspected drug dealers. Brashear identified a number of other participants in the conspiracy including George Clark and Rick Brashear (Jeremy Brashear's uncle). He also identified a man named Josh Wilson as a participant prior to when he (Brashear) became involved with the home invasions. He advised that Rick Brashear identified three drug dealers that they could rob (Jerry Delaney, Roger Cornett, and Carew Messer).

32. Brashear advised that he used a sawed-off 20 gauge shotgun during one home invasion, that the shotgun came from the Caldwell home invasion, that he had obtained the shotgun from either Clark or Bowling, and that he thought that Clark kept the shotgun on the hill behind his residence. Brashear advised that Clark insisted on keeping the firearms that were used during the home invasions other then the .45 caliber pistol that Bowling carried. He advised that George Clark always carried the same AR-15 during the home invasions. Brashear advised that Clark said that the AR-15 that he (Clark) carried belonged to his wife, Deidre Clark. Brashear advised that Bowling purchased an Olympic Arms AR-15 in or around London, KY and he (Brashear) carried that firearm during the other home invasions.

-6-

33. Brashear confirmed that George Clark fired a round during the home invasion at Jerry Delaney's residence.

34. On August 24, 2006, a Kentucky Fish and Wildlife canine unit searched the same area behind George and Deidre CLARKS' residence that officers with ATF and KSP had searched on August 21, 2006. The K-9 unit hit on an area under a large tree that had fallen.  The following items were located hidden under the fallen tree:

    1.  A camouflage jumpsuit and a green jumpsuit that were covered in leaves under the tree.  The jumpsuits had a green gun case inside them and the gun case contained the following:

    2.  A Rock River Arms Inc., Model LAR-15, .223 caliber rifle, serial number: CM51939.

    3.  An Olympic Arms, Model PCR, .223 caliber rifle, serial number SM2203.

    4.  A Highpoint, Model C9, 9mm pistol, serial number: P193559, loaded with five rounds.

    5.  Three AR-15 magazines, two taped together in a tactical configuration, that contained an unknown quantity of ammunition due to pending ATF laboratory examination.

35. A second group of firearms were located under a cluster of small trees and leaves.  The following items were located at the second location:

    1.  Savage Arms Inc., Model 64, .22 caliber rifle, serial number: 0517672.

    2.  Marlin, Model 60W, .22 caliber rifle, serial number: 09402770.

    3.  Marlin, Model 150M, .22 caliber rifle, serial number: 71528841.

    4.  Marlin, Model 1895SS, 45-70 caliber rifle, serial number: 04069309.

    5.  Remington, Model 17, 20 gauge shotgun, serial number: 63657 with a 12.5 inch barrel.

-7-

36. Home invasion victim, Kenneth Caldwell, identified the Savage Arms Inc.,
Model 64, .22 caliber rifle, serial number: 0517672, the Marlin, Model 60W,
.22 caliber rifle, serial number: 09402770, the Marlin, Model 150M, .22 caliber
rifle, serial number: 71528841, the Marlin, Model 1895SS, 45-70 caliber rifle,
serial number: 04069309, and the Remington, Model 17, 20 gauge shotgun,
serial number: 63657 with a 12.5 inch barrel as items that were stolen from him
during a home invasion.

37. On August 24, 2006, KSP Detective Fugate obtained a second state search
warrant from Leslie County, KY District Judge Renee Muncy for Clark's
residence located in Leslie County, KY. Detective Fugate served the search
warrant on August 24, 2006.

38. Officers noted that the computers that they had observed in the residence during
the search warrant that they had executed at the same residence on August 19,
2006 had since been removed.

39. KSP located spent shell casings near the front porch of the residence, in the
parking lot of the residence, and at a large shelter across the hill from the
CLARKS' residence that they had not collected during the previous search
warrant. They located the following spent shell casings:

      1.   7 Wolf .223 caliber spent shell casings – shelter area

      2.   1 Winchester .223 caliber spent shell casing – shelter area

      3.   6 .223 caliber spent shell casings – parking lot

      4.   1 Winchester 7.62 x 39 spent shell casing – parking lot

      5.   8 Federal .223 caliber spent shell casings – porch area

      6.   1 Winchester .223 caliber spent shell casing – porch area

      7.   6 .223 caliber spent shell casings – porch area

      8.   2 Winchester 7.62 x 39 spent shell casings – porch area

40. On August 29, 2006, Detective Fugate, TFO John Couch and I interviewed
George Clark at the Leslie County, KY courthouse. Clark had been arrested for
unrelated charges on August 20, 2006 and had been transported from the Clay
County Jail to the Leslie County Courthouse for a hearing.

-8-

41. I identified myself to Clark and explained Clark's constitutional warnings to him. Clark indicated that he understood, advised that he did not have an attorney, that the court had not appointed an attorney for him, waived his constitutional warnings, and agreed to be interviewed.

42. Clark advised that he knew about the home invasions and that they had been taking place for the last 4 to 5 weeks (approximately). He advised that he had a foot problem and that he could not have participated (physically incapable), but stated that he was involved. Clark advised that he gave advice to James Bowling, Jeremy Brashear, Dan Hoskins, Josh Wilson, and Jake "Last Name Unknown." He advised that they came to him for advice because he (Clark) had been convicted of Armed Robbery for conducting home invasions. Clark advised that Bowling knew he had been convicted because he (Clark) had talked to Bowling about doing time for participating in home invasions.

43. Clark advised that he pled guilty in 1998 to two counts of Armed Robbery that took place in McCreary County, KY and Whitley County, KY. He advised that he was on parole.

44. Clark advised that Bowling and Brashear came to his residence two or three weeks ago and that they were putting on their gear. Clark advised that they had t-shirts and hats that had "Police" written on them. Clark advised that he told them he had to use the bathroom, went inside of the house, and videotaped them while narrating. He advised that he could provide that videotape to me, but has not done so as of the date of this affidavit.

45. Clark advised that Bowling had an Olympic Arms M-4 and a .45 caliber automatic pistol. He advised that Brashear had a pistol and a shotgun. Clark advised that the pistol looked like an H and K Mark 21. He advised that they wanted to borrow his four wheeler to take items into the mountains and that he guessed that the items that they were taking into the woods were firearms - Detective Fugate advised that he had previously spoken with Clark and told him that they had recovered the firearms that were hidden behind his residence.

46. Clark advised that his wife (Deidre Clark) was the one who possessed/owned the ammunition in the residence and that she had a firearm. He advised that their house had been broken into and that was the reason she had gotten the firearm. Clark advised that she had an M-4, but that he did not know the manufacturer of the firearm.

47. Clark advised that his mother in law had the computer that was missing from his residence when the Kentucky State Police executed a second search warrant at the residence.

-9-

48. On August 29, 2006, Detective Fugate, TFO Couch, and I located Helen
Morgan, Clark's mother in law, in the Leslie County, KY Courthouse. I
identified myself and advised that I was attempting to locate a computer that
was present at the Clark residence during the execution of the first search
warrant at the residence, but that was discovered to be missing during the
execution of the second search warrant. Morgan advised that she had the
computer at her residence. She advised that they had retrieved the computer
from Clark's residence, that it was her granddaughter's computer (juvenile), and
that she had retrieved the computer so that it would not be stolen and to allow
her granddaughter to use it for her school work. Morgan advised that her two
granddaughters had been living at her residence since Deidre and George Clark
had been arrested on August 20, 2006. I indicated to Helen Morgan that I
wanted to examine the contents of the computer and she consented to give the
computer to me.

49. On September 8, 2006, I interviewed Deidre Morgan Clark. She had arrived at
KSP Post 13 so that she could provide a statement. I identified myself to Deidre
Clark and advised her of her Miranda warnings. Clark indicated that she
understood and agreed to be interviewed.

50. Clark advised that there had been all kinds of people in her residence that didn't
belong there since the execution of the search warrants (August 19th and August
24th).

51. Clark advised that she had witnesses who observed the firearms that were listed
in the newspaper (recovered behind the Clark's residence) at James Bowling's
residence. She advised that the witnesses observed these firearms at Bowling's
residence on August 14th and on the Monday or Tuesday after she and George
Clark were arrested. She advised that these witnesses asked her not to identify
them until court. She advised that she can't and won't tell who these witnesses
are until it is time to appear in court.

52. Clark advised that she did not have any idea who those above described
firearms belonged to. She advised that she had purchased a Rock River AR-15
from H and K (a gun store in Bonnyman, Perry County, KY) for $1,000 a few
months prior to the interview. Clark advised that she had purchased the firearm
because it was the same firearm that George Clark had in the military when he
was an Army Ranger and for no other reason.

53. Clark advised that George Clark was very angry that she had purchased the
firearm because he was a felon and could not possess a firearm. She advised
that he told her to take it back and that she kept it until she sold it to James
Bowling for $2500 during the first week of August (2006). Clark advised that

-10-

she stored the firearm at her mother's residence and that it was never in her house after that first day.

54. Clark advised that George Clark touched the firearm once, on the day she bought it, when she had gotten it out of the box, and then he handed it right back to her. She advised that this took place at her residence and that George Clark had not possessed any other firearms.

55. Clark advised that she had shot the firearm on the front porch and that her cousin, Ryan Garrison, had shot the firearm around the pond. Clark advised that Bowling had set up George Clark.

56. Clark advised that she liked firearms, that she doesn't use illegal drugs, and that she had not used illegal drugs since she had been taken to jail. She advised that she had not grown marijuana in 10 years. Clark advised that neither she nor George Clark have been in possession of marijuana, especially not George, since they had been together. Clark advised that they had been together 5 years and that they had been married for 4 years.

57. Clark advised that she was there to proclaim George Clark's innocence and that George Clark did not and could not have committed the home invasions. Clark advised that she had a videotape (of Bowling and Brashear putting on police gear) and advised that she would provide a copy of this videotape to me, but has not done so as of the date of this affidavit.

58. An examination of the lap top computer that was given to me by Helen Morgan on August 29, 2006 revealed that the computer contained the following:

1. A photograph dated March 8, 2006 of George Clark holding an AR-15 rifle that appeared to be the same Rock River AR-15 that was recovered behind his residence on August 24, 2006.

2. Four photographs dated August 4, 2004, two of which showed George Clark holding a Marlin Model 10-22, .22 caliber rifle and two of which showed Deidre Clark holding the Marlin Model 10-22, .22 caliber rifle.

3. Three photographs dated September 9, 2005 that showed Deidre Clark holding suspected marijuana.

4. Three photographs dated November 6, 2005, two of which showed George Clark holding suspected marijuana and one of which showed Deidre Clark holding suspected marijuana.

-11-

59. On September 5, 2006 I requested a trace for the Rock River Arms, Inc., LAR 15 .223 caliber rifle, S/N: CM51939 that was located hidden behind George and Deidre Clark's residence on August 24, 2006. The Firearms Trace Summary showed that Deidre L. Clark purchased this firearm from H and K Gun and Pawn Shop on February 28, 2006. I obtained a copy of the ATF F 4473 related to Deidre Clark's firearms purchase from H and K Gun and Pawn Shop and confirmed that she had purchased the firearm.

60. On October 12, 2006 I interviewed John Akemon, an employee at H and K Gun and Pawn. Akemon advised that he was a United States Marine Corp Sniper in Vietnam and that he was a competitive shooter after he returned from Vietnam. He advised that George Clark came into the store at least 3 times, maybe 4 times, but that he did not remember Clark buying anything. Akemon advised that he thought that Clark started coming into the store in the spring of 2006.

61. Akemon advised that Clark was mostly interested in AR-15 type firearms and bolt action sniper rifles. He advised that Clark brought up his military experience and that Clark mentioned Somalia and acted as if he had been there. Akemon advised that Clark knew a lot about shooting and firearms. Akemon thought that Clark had said that he started in the Army Ranger program at Ft. Benning, but that he had to leave, and did not finish. Akemon advised that Clark implied that he had just gotten out of the military and that he wanted something similar (to what he had when he was in the military). Akemon recalled that Clark was fascinated with sniper equipment.

62. Akemon advised that Clark asked which one of the AR-15 type firearms was the best and Akemon told him that Rock River Arms firearms were the best. He advised that Clark asked to look at the firearms and Akemon advised that he handed Clark different AR-15s and showed him the differences.

63. Akemon advised that Clark was very interested in the Rock River Arms specification, why Rock River Arms were better then the other firearms, and advised that he acted like he wanted one to keep. Akemon advised that Clark acted like he was always on the verge of buying a firearm and that he was going to come back to buy one.

64. Akemon advised that the Rock River Arms LAR-15 firearms were in the $800 to $1100 range, depending on the equipment, and that a match quality Rock River Arms was approximately $1100. He advised that most of the Rock River Arms LAR-15 firearms that they had were approximately $950.

65. On November 9, 2006, TFO Couch and I contacted Danny D. Hoskins at his residence in Leslie County, KY. I explained to Hoskins that he was not under arrest and Hoskins agreed to be interviewed. Hoskins was not made aware that

-12-

Bowling had placed an undercover controlled recorded phone call to him on August 21, 2006.

66. Hoskins advised that he had talked to Deidre Clark since she had been out of jail and that he had taken her to the Clay County, KY Jail so that she could visit George Clark.

67. Hoskins advised that the day after the evening during which James Bowling was arrested, he had traveled to James Bowling's residence to look at purchasing the residence because Bowling was having financial troubles and was interested in selling his house. He advised that he did not know that Bowling had been arrested when he traveled to the residence.

68. Hoskins advised that he arrived between 10:00am and 11:00am and that George Clark was in Bowling's driveway changing a flat tire. Hoskins advised that George Clark and Deidre Clark were arguing.

69. Hoskins advised that George Clark was in a hurry, acted nervous, and spoke urgently. Hoskins advised that he thought that Clark was acting strangely. Hoskins advised that Clark asked him to come over to their Jeep and asked Hoskins to do something for him.

70. Hoskins advised that Clark advised that he had a gun case and a pistol, asked Hoskins to take them, and then meet him in about an hour near a pond on the hill behind Clark's residence. Hoskins advised that Clark said for Hoskins to meet him there and to bring the firearms with him and that he (Clark) would meet him on a four wheeler.

71. Hoskins advised that Clark threw a gun case and a pistol into the back seat of his (Hoskins') vehicle. Hoskins advised that the gun case was either dark green or black and that it was heavy. He advised that the gun case had a pair of camouflaged pant or coveralls wrapped around it and that it was dirty. Hoskins advised that the gun case felt heavy enough that he believed it contained 2 or 3 firearms. He advised that it was definitely too heavy to contain only 1 firearm.

72. Hoskins described the pistol as a black, cheap 9mm automatic pistol. He advised that 9mm was written on the side of the pistol and he did not know if the firearm was loaded.

73. Hoskins advised that Clark had never asked him to do something like this before. Hoskins advised that he had never observed Clark with any firearms other then on that day. He advised that Deidre Clark saw George Clark throw the firearms into the back of his (Hoskins') vehicle.

-13-

74. Hoskins advised that he met Clark later that same day at the location where
Clark had told him to be. Hoskins advised that Clark was on a four wheeler and
that Clark was by himself. Hoskins advised that he gave Clark the gun case and
pistol and that Clark left on the four wheeler.

75. On November 15, 2006, TFO John Couch and I interviewed Richard (Rick)
Brashear. Brashear essentially stated that his nephew, Jeremy Brashear, and
two other unidentified men arrived at his residence in Perry County, KY
sometime during the summer of 2006 and he continuously referred to one of the
unidentified men as the taller one of the two unidentified men. Commonwealth
of Kentucky Driver's License data listed George Clark as 6'1" and James
Bowling as 5'6".

76. Rick Brashear stated that Jeremy Brashear and the other two men said that they
had been robbing drug dealers. He advised that they told him that they had
uniforms and AR-15s and that they had robbed a number of drug dealers in
Leslie County, KY. Rick Brashear stated that the men asked if he knew of any
drug dealer and Rick Brashear advised that he told them that he did. Brashear
advised that the men wanted him to show them the drug dealer's residence
immediately and said that they would pay him with gas and cigarettes.

77. Brashear advised that the three men followed him in their own vehicle, a white
SUV, and that he drove in his own vehicle. Brashear advised that his wife,
Sherry Brashear, and her niece, Missy Begley, road with him. He advised that
Begley liked the way that the taller of the two unidentified men looked.

78. Brashear advised that Brashear and the two other men followed him to
Hardburly, Perry County, KY. He advised that one of the two unidentified
suspects got in with him and he showed the man a residence of a suspected
Oxycontin dealer (Delaney). Brashear advised the unidentified man told him
that was what they wanted and Brashear dropped him off with Jeremy Brashear
and the other unidentified man. Brashear advised that he thought that the taller
man was the one who had gotten into the vehicle with him.

79. Brashear advised that he, his wife, and his wife's niece then left to drive back
home. Brashear advised that Jeremy Brashear and the other two men caught up
with them at a gas station. He advised that the three men threw something into
the trunk of his car. Brashear advised that the taller unidentified man then
jumped in the back of his vehicle with Missy Begley.

80. Brashear advised that Jeremy Brashear and the other unidentified man
followed them in the direction of his residence. Brashear advised that
Jeremy and the other unidentified man were right behind them when they
were stopped by the police.

-14-

81. Brashear advised that the tall man riding with Missy Begley stated that he had to hide the items that were in the trunk when he got to Brashear's residence. Brashear advised that the taller unidentified man hid something in the weeds behind his residence. Brashear advised that the tall unidentified man and Missy Begley spent the night together in his extra bedroom.

82. Brashear advised that the tall man called his wife/girlfriend the next morning and that the man told him he was calling Leslie County. Brashear advised that he drove the tall man to a nearby store and that he man met two women. Brashear advised that when he returned home he saw that the tall man had left firearms in the weeds behind his residence. Brashear advised that later that same day, the tall man returned with the same two women and retrieved the firearms. Brashear said that the tall man showed him two AR-15s and police uniforms that were in a duffel bag. Brashear advised that he had not had any contact with the tall suspect since that day.

83. Rick Brashear advised that at some point during the same night Jeremy Brashear and the other two men robbed Carew Messer. He advised that he could not recall all of the details from that night because it had taken place a significant time prior to the interview. Rick Brashear advised that at some point during the same evening they met with the three men on Hall Mountain. He advised that the three men were rummaging through items that they had stolen when they said that they had robbed Carew Messer. Brashear advised that he observed prescription pill bottles that confirmed that they had been to Messer's residence.

84. I showed Brashear a photo line-up that included a photo of George Clark as #2 of in a six photo line-up. SA Baker asked Brashear if he could identify the person he referred to as the tall man from the photo line-up. Brashear advised that on a scale of 1 to 10, he was 8/10 sure that the tall man was #2.

85. On November 16, 2006, TFO John Couch and I interviewed Missy Begley. She advised that sometime during June or July of 2006 Jeremy Brashear, George "Last Name Unknown" (LNU), and a third older man arrived at her Uncle Rick Brashear's residence. She advised that she had been drinking that day.

86. She advised that she road with Rick Brashear and Sherry Brashear while Jeremy Brashear, George "LNU", and the older man followed them in a white SUV. She advised that at some point later in the evening, George "LNU" got into the vehicle with her, Rick Brashear, and Sherry Brashear at a gas station. She advised that George "LNU" put something in Rick

-15-

Brashear's vehicle. Begley also advised that at some point during the same night they went to Hall Mountain.

87. Begley advised that Rick Brashear, Sherry Brashear, George "LNU" and she returned to Rick's residence. She advised that Rick would not allow George "LNU" to bring the items from the trunk of the car into the residence.

88. Begley advised that she and George "LNU" spent the night together at Brashear's residence. She advised that George "LNU" used the phone early the next morning and told someone to come and get him. Begley advised that George "LNU" left before daylight and she thought that Brashear dropped him off. She advised that George "LNU" returned later the same day with a woman in a white car and she had not seen him since that date.

89. Begley advised that she knew that George "LNU", Jeremy Brashear, and the older suspect had done something that they should not have done. She advised that she figured that they had done something illegal because George "LNU" talked about Jeremy Brashear getting caught, then she saw George with a significant amount of pills, and she saw a duffel bag in the trunk of Rick Brashear's vehicle. She advised that George "LNU" said that he was in the military and that he mentioned the Special Forces.

90. I showed Begley a photo line-up that included a photo of George Clark as number two in a six photo line-up. I asked Begley if she could identify the person she referred to as George. Begley positively identified photograph number two as George "LNU."

91. Preliminary examination of a portion of phone toll records that have been obtained with Federal Grand Jury subpoenas showed that on August 19, 2006 at 12:46am, a phone call was made from Rick Brashear's residence to James Bowling's residence and that the call lasted 45 seconds. The records showed that the next two calls from Bowling's residence, at 1:40am and 1:47am respectively, were to jails located in Perry County, KY. The next call from Bowling's residence was at 1:52am and was to the Perry County Sheriff's Department. In addition to other calls, there were two calls made from Bowling's residence to Deidre Clark's cellular phone, one at 2:41am for 39 seconds and another at 3:10am for 45 seconds.

92. I contacted George Clark's probation officer who subsequently sent me portions of Clark's file that included two Commonwealth of Kentucky Pre-sentence/Post Sentence Investigative Reports (PSI) from Whitley County and McCreary County. The Whitley County PSI showed that Clark was convicted of two counts of Robbery 1st degree on September 14, 1998 and sentenced to two 15 year terms of incarceration (concurrent). The PSI

-16-

showed that on July 1, 1998 and August 11, 1998 Clark and other individuals posed as police officers and robbed suspected drug dealers at gunpoint.

93. The McCreary County PSI showed that Clark was convicted of two counts of Robbery 1st degree on August 11, 1998 and sentenced to two 10 year terms of incarceration (concurrent). The PSI showed that on July 3, 1998 Clark and other individuals posed as police officers and robbed a suspected drug dealer at gunpoint. They then kidnapped the victim and forced him to take them to the victim's neighbor's house. Clark and the other men then posed as police officers and robbed the neighbor as well.

94. I received certified court documents from McCreary and Whitley Counties that showed that George Clark has been convicted of four separate counts of Robbery 1st degree.

95. The home invasion victims/residences have been identified through the course of the investigation as (in chronological order): Kenneth Caldwell residence (Leslie County, KY), Johnny Ed Melton residence (Clay County, KY), "Bo" Medlin residence (Laurel County, KY), Geraldine Fouts residence (Leslie County, KY), Roger Cornett residence (Perry County, KY), Jerry Delaney residence (Perry County, KY), and the Carew Messer residence (Perry County, KY). Victims from six of the seven residences have been interviewed and confirmed that they were robbed at gunpoint by armed men posing as police officers.

96. The victims of the home invasion in Laurel County, KY (Bo Medlin) have not been interviewed. On various dates during the course of this investigation I contacted representatives from the Drug Enforcement Administration and the United States Attorney's Office concerning the identification of the individuals who resided at a residence in Laurel County, KY that was identified by Bowling as being a home invasion location. I learned that the residents had been the targets of a Federal investigation for trafficking Cocaine, Marijuana, and Methamphetamine and that their residence was vacant because they were incarcerated. I also learned that during the course of their Federal investigation it was learned that these drug suspects had been robbed during a home invasion in August 2006.

97. On January 4, 2007, I contacted UNITE Detective James Grigsby. Detective Grigsby advised that he is the case officer who investigated Jerry Delaney for drug trafficking crimes. Detective Grigsby advised that Delaney was arrested on October 6, 2006 after he had sold quantities of Oxycontin during an undercover investigation. Detective Grigsby advised that the Delaney investigation was going to be pursued in Federal court.

-17-

98. On January 4, 2007, I requested a Kentucky Courtnet Query through KSP
for Carew Messer. The Courtnet Query showed that Messer was charged
with three counts of Trafficking in a Controlled Substance 1st Degree, one
count of Trafficking in a Controlled Substance 2nd Degree, and one count of
Trafficking in a Controlled Substance 3rd Degree on May 6, 2004. The
query showed that Messer pled guilty on October 3, 2005 and that he was
sentenced to 5 years of incarceration on September 12, 2006.

99. Based upon the aforementioned facts, I believe that probable cause exists
that George Clark interfered with commerce (drug traffickers) by threats or
violence in violation of Title 18 U.S.C. Section 1951 on seven occasions,
brandished a firearm during and in relation to a crime of violence in
violation of Title 18 U.S.C. Section 924(c)(1)(A) on seven occasions,
conspired to interfere with commerce by threats or violence, and conspired
to brandish and discharge a firearm during, in relation, and or in furtherance
of Federal crimes of violence in violation of Title 18 U.S.C. Section 371.



Jeffrey S. Baker
Special Agent, ATF

Subscribed and Sworn to before me
This 29 th day of January 2007

Signed By:
Edward B. Atkins *EβA*
United States Magistrate Judge