```
                    United States District Court
                    Eastern District of Kentucky
                    Southern Division at London
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | London Criminal |
| | ) | Action No. 07-13-SSS |
| vs. | ) | |
| | ) | London, Kentucky |
| GEORGE CLARK | ) | May 21, 2008 |
| | ) | 1:00 p.m. |
| | ) | |

```
              TRANSCRIPT OF TESTIMONY OF DONNA S. FARLER
           BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY
```

Appearances of Counsel:

| | |
|---|---|
| On behalf of the United States: | ROGER WEST, ESQ.<br>Assistant U.S. Attorney<br>260 West Vine Street<br>Suite 300<br>Lexington, Kentucky  40507 |
| On behalf of the Defendant: | DAVID S. HOSKINS, ESQ.<br>107 East First Street<br>Corbin, Kentucky  40701 |
| Court Reporter: | CYNTHIA A. OAKES, CRR<br>Official Court Reporter<br>United States District Court<br>560 Athens Boonesboro Road<br>Winchester, Kentucky  40391<br>(859) 983-4346 |

Proceedings recorded by mechanical stenography,
transcript produced by computer.

1 (Whereupon, the jury returned to the courtroom, after which
2 the following proceedings were had.)
3 THE COURT: Thank you. The record will reflect that
4 all members of the jury are present. The defendant and counsel
5 are also present in the courtroom. I believe before lunch we
6 finished with the testimony of Mr. Cornett.
7 Mr. West, are you prepared to call your next witness?
8 MR. WEST: Yes, Your Honor. Donna Farler, please.
9 DONNA S. FARLER,
10 having been first duly placed under oath, was examined and
11 testified as follows:
12 DIRECT EXAMINATION
13 THE COURT: Thank you.
14 Mr. West, you may proceed.
15 MR. WEST: Thank you, Your Honor.
16 DIRECT EXAMINATION
17 BY MR. WEST:
18 Q   Would you state your full name, please, ma'am?
19 A   Donna S. Farler.
20 Q   Ms. Farler, what county do you live in at this time?
21 A   I live in Jessamine County.
22 Q   Do you know Roger Cornett?
23 A   Yes, I do.
24 Q   How long have you known him?
25 A   About three-and-a-half years.

1  Q    Do you know where Roger lived at?
2  A    Yes.
3  Q    Where is that at?
4  A    He lived on River Bend Lane in Jeff.
5  Q    Okay. And what county is that in, ma'am?
6  A    Perry.
7  Q    Okay. About two years ago, did you occasionally reside
8  with Mr. Cornett there?
9  A    Yes, sir, I did.
10 Q    Specifically on August 18th of 2006, were you staying with
11 Mr. Cornett at that time?
12 A    Yes.
13 Q    Ma'am, in the early hours of the morning, were you and
14 Mr. Cornett awakened by a sound outside?
15 A    Yes, sir.
16 Q    Do you recall about what time that was, Ms. Farler?
17 A    It was between 3:00 -- I'd say 3:00 and 3:15. I heard the
18 car pull down the lane, it stopped, two car doors slammed, it
19 started back up, backed out the lane about 75 feet and stopped,
20 and the next thing I knew they were kicking the door.
21 Q    All right. Where were you at when you heard them kicking
22 the door?
23 A    In the bed.
24 Q    In the bedroom. Then what did you do from there?
25 A    Well, we got up, and at the time, his door didn't have a

1  lock on it, so we had the couch down the hallway to keep it
2  shut.  And for whatever reason, they said they were UNITE and
3  they wanted in, and he, for whatever reason, thought that it was
4  somebody running from the law and they wanted in.
5  Q    All right.  What did you see with regards to the people
6  that entered the residence?
7  A    So when he scooted the couch back away from the door, the
8  first thing I saw was a ski mask and a semiautomatic weapon in
9  his face and mine.
10 Q    All right.
11 A    And another man behind him.
12 Q    All right.  What color was the clothing they were wearing?
13 A    Black.
14 Q    You said "semiautomatic."  You mean pistol or rifle?
15 A    Rifle.
16 Q    What did this first person say to you?
17 A    Lay down, get down on the floor, and they tied us up.
18 Q    Okay.
19 A    And then he told whoever it was to go search throughout the
20 house, and then he asked Roger where the money was.
21 Q    Were they making references to each other, calling each
22 other by name?
23 A    No.
24 Q    Could you tell whether or not the first one was taller or
25 shorter than the second one?

Case: 6:07-cr-00013-DCR-JGW  Doc #: 232  Filed: 05/27/08  Page: 5 of 13 - Page ID#: 843
DONNA FARLER - DIRECT - MR. WEST                    5

1  A    Taller.  Pretty good-sized man.
2  Q    All right.  Did you have any items in the house yourself?
3  A    I had a purse which they stole, my whole purse.
4  Q    All right.  What was in your purse, Ms. Farler?
5  A    Just my personal belongings, my pictures, my IDs, my
6  medical cards, things that you just -- a lot of them you can't
7  replace.
8  Q    Did you have any money in there?
9  A    No.
10 Q    Did you have any medication in there?
11 A    No.
12 Q    To your knowledge, what happened with the vehicle that was
13 outside?
14 A    Well, after they got through doing what they wanted to do,
15 they unhooked the phone and they said the State Police will be
16 on their way in ten minutes and you do not get up -- Well, first
17 he threatened to kill us.
18 Q    Which one?
19 A    The one standing over top of us.
20 Q    All right.  Was that the first one that entered the
21 residence or the second one?
22 A    That's the first one that entered the residence.
23 Q    Okay.  What did he say exactly, if you can remember?
24 A    He said, "Get down on the floor," and he said, "And if you
25 make a move," he said, "I will kill you."

1  Q    Do you know whether or not these individuals were wearing
2  gloves?
3  A    I believe so.
4  Q    Do you recall what items they took out of the residence
5  that belonged to Mr. Cornett?
6  A    Oh, my goodness, they took his medicine bag, which had
7  his -- just his ibuprofen, his breathing medication, he had some
8  of his mother's medication that he needed to get refilled for
9  her, they took shoes, they tore the clothes -- the closet apart,
10 they took clothing.  I mean, stuff that didn't even mean
11 anything.
12 Q    Could you tell whether or not any of the two was giving
13 direction to the other one?
14 A    Yes, the first one was giving the second one direction.
15 Q    All right.  And the first one is the taller one of the
16 subjects?
17 A    Yes.
18 Q    I'm going to ask you if you recall speaking to Special
19 Agent Jeff Baker at some point, this guy right here?
20 A    Yes, on the phone.
21 Q    Okay.  Now, I had asked you before whether or not these
22 suspects referred to each other by any name or anything of that
23 nature?
24 A    No.
25 Q    All right.  They didn't refer to any by name?

1 A No.
2 Q Did they refer to each other by number?
3 A One and two.
4 Q One and two, okay. Could you tell whether or not one of
5 them had a better speech, had better vocabulary than the other
6 one?
7 A No. The tall -- the first one that was standing overtop of
8 us had a deeper voice, and that's about the only thing that --
9 Q And the first individual that entered your home, do you
10 recall what color his weapon was?
11 A Seems to be black.
12 Q And what about the second one?
13 A Seems to be the same, best I recollect.
14 Q At what time did you realize these guys weren't police?
15 A Probably seven minutes into this.
16 Q Was there anything in particular that made you draw that
17 conclusion, ma'am?
18 A Well, actually Roger said -- I said, "Roger, they're going
19 to kill us." And he says, "Baby," he said, "calm down," he
20 said, "because they're just going to rob us."
21 Q Okay. Ms. Farler, what happened just before they left?
22 A Like I said, they said the State Police would be on their
23 way in about ten minutes and you do not get up and we will be
24 watching and, if you do, we will blow the top of your heads off.
25 Q Could you tell what direction they went when they left the

1 residence?
2 A   They went out the lane. I'm not really sure if they went
3 on straight up on 7, I believe.
4 Q   Were they on foot, or were they in the vehicle?
5 A   They were in the vehicle because I heard the vehicle start
6 back up and leave the lane.
7 Q   Were you still tied up when they left the residence?
8 A   Yes.
9 Q   How did you get untied?
10 A   Well, they actually just basically took twine and tied us
11 up behind our backs, so it wasn't too hard to get out of it.
12 And then I got up and realized that the phone was unplugged. I
13 plugged it back up and immediately called 9-1-1.
14             MR. WEST: Nothing else of this witness, Your Honor.
15             THE COURT: Thank you.
16             Mr. Hoskins, you may cross --
17             You'll need to sit back down. There are just a few
18 other questions that the attorney may ask you.
19             THE WITNESS: Okay.
20             THE COURT: That's fine.
21             Mr. Hoskins, you may examine the witness.
22             MR. HOSKINS: Thank you.
23                         CROSS-EXAMINATION
24 BY MR. HOSKINS:
25 Q   Ms. Farler, do you know anybody by the name of Steven

1  Begley?
2  A    No.
3  Q    Do you recognize that name at all?
4  A    No.
5  Q    Do you know Jeremy Brashear?
6  A    No.
7  Q    Rick Brashear?
8  A    Yes, I know Rick.
9  Q    Now, you testified that the first person who came through
10 the door was taller than the second?
11 A    Uh-huh.
12 Q    And the first one that came through the door seemed to be
13 in charge?
14 A    (Witness nodding head affirmatively.)
15 Q    About how much taller was the first one than the second?
16 A    I would say probably three to four inches taller.
17 Q    And the first one had a deeper voice?
18 A    Yes.
19 Q    And you called 9-1-1 right away when that happened?
20 A    Yes, I did.
21 Q    Did you describe the car that they were in?
22 A    I couldn't because they told us not to get up.  So the only
23 thing I know, it was very, very loud, like it didn't have a
24 muffler on it.
25 Q    Do you know if it was described as a red sports car?

1 A    I recall later on maybe that would be correct.
2 Q    I guess I don't understand. You recall later on?
3 A    No. Just like in the papers or just word of mouth, that
4 maybe they were driving a red car.
5 Q    Okay. You don't recall seeing that?
6 A    No, I did not. It was 3:00 -- like I say, it was like
7 3:30 in the morning and pitch black dark, and they refused to
8 let us up.
9 Q    Have the police been there before?
10 A   No.
11        MR. HOSKINS: Your Honor, if I could have just a
12 minute. I was given some documents just before the witness was
13 called.
14        THE COURT: Yes, sir. That's fine. If you need to
15 review those at counsel table, you can certainly do so.
16 BY MR. HOSKINS:
17 Q    Mr. Farler, do you know if Mr. Cornett had a record of drug
18 trafficking?
19 A    No, sir.
20 Q    Did you know him back in the '90s? You said you just met
21 him in --
22 A    No, I've only known him -- I met him approximately
23 three-and-a-half years ago and fell in love with the man.
24 Q    Have you ever been involved with any illegal drug activity?
25 A    No.

1  Q    Ever been charged with attempting to obtain controlled
2  substances by fraud?
3  A    No.
4  Q    Are you Donna Sue Farler?
5  A    Uh-huh.
6  Q    Is your date of birth the 12th of August, 1967?
7  A    That's correct.
8  Q    And you were never arrested on those charges?
9  A    I was arrested for DUI and they tried to get me for
10 conspiracy to distribute.
11 Q    Conspiracy to distribute drugs?
12 A    Uh-huh.
13 Q    Now, when was --
14 A    That was in '94 or '95. But it was thrown out.
15 Q    Was that in Perry County?
16 A    Yes, sir. My ex-fiance had requested that I go to Wal-Mart
17 and pick up a prescription for him, which another woman had
18 stole the DEA script pads from a doctor in Lexington, and I had
19 no idea what they were doing. And he sent me, and I took the
20 fall. They did dismiss that charge.
21 Q    And you didn't know Roger back then?
22 A    No.
23 Q    Do you see that man there in the white shirt?
24 A    Yes.
25 Q    Do you recognize ever seeing him before?

1  A     No, I do not.
2            MR. HOSKINS:  That's all.  Thank you.
3            THE COURT:  Thank you, Mr. Hoskins.
4            Mr. West.
5            MR. WEST:  Yes.
6            THE COURT:  Just one moment.
7                      REDIRECT EXAMINATION
8  BY MR. WEST:
9  Q     I'm almost done, Ms. Farler.  Ms. Farler, did you ever see
10 Roger Cornett sell drugs?
11 A     No, sir.
12 Q     Did you ever sell drugs?
13 A     No, sir.
14 Q     How well do you know Rick Brashear?
15 A     Just in passing.  I went to school with his children.  I
16 was friends with his children, which his one son is deceased
17 now.
18 Q     How tall is Rick, do you know?
19 A     I would say Rick is probably about six-two.
20 Q     Okay.  These fellows that came in your house, were they as
21 tall as Rick, were they taller than Rick, or were they shorter
22 than Rick?
23 A     A little bit shorter than Rick.
24           MR. WEST:  That's all.  Thank you, Your Honor.
25           THE COURT:  Mr. Hoskins, any questions of this

1  witness?

2  　　　MR. HOSKINS:  No questions for this witness, but may
3  we approach?

4  　　　THE COURT:  Before you approach, any objection to her
5  being finally excused?

6  　　　MR. HOSKINS:  No, Your Honor.

7  　　　THE COURT:  All right.  Ms. Farler, you may be excused
8  at this time.

9  　　　(Proceedings concluded at 1:15 p.m.)

10 　　　C E R T I F I C A T E

11 　　I, Cynthia A. Oakes, certify that the foregoing is a
12 correct transcript from the record of proceedings in the
13 above-entitled matter.

14

15 5/26/2008　　　　　　　　　　　　s/CYNTHIA A. OAKES
　　　DATE　　　　　　　　　　　　　CYNTHIA A. OAKES, RPR, RMR, CRR
16

17

18 　　　　　　　　　　I N D E X

19 　　　　　　　　　　　　　　　　　　　　　　　　　　PAGE

20 Testimony of DONNA FARLER:
　　　Direct Examination by Mr. West:　　　　　　　2
21 　　　Cross-Examination by Mr. Hoskins:　　　　　 8
　　　Redirect Examination by Mr. West:　　　　　 12
22

23

24

25