United States District Court
Eastern District of Kentucky
Southern Division at London

UNITED STATES OF AMERICA ) London Criminal
 ) Action No. 07–13–SSS
 vs. )
 ) London, Kentucky
GEORGE CLARK ) May 21, 2008
 ) 1:55 p.m.
 )


TRANSCRIPT OF TESTIMONY OF RICK BRASHEAR
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY


Appearances of Counsel:

On behalf of the United States: ROGER WEST, ESQ.
 Assistant U.S. Attorney
 260 West Vine Street
 Suite 300
 Lexington, Kentucky  40507


On behalf of the Defendant: DAVID S. HOSKINS, ESQ.
 107 East First Street
 Corbin, Kentucky  40701


Court Reporter: CYNTHIA A. OAKES, CRR
 Official Court Reporter
 United States District Court
 560 Athens Boonesboro Road
 Winchester, Kentucky  40391
 (859) 983–4346


Proceedings recorded by mechanical stenography,
transcript produced by computer.

1    (Whereupon, the following proceedings were had in the

2  presence of the jury.)

3         THE COURT:  Mr. West, you may call your next witness.

4         MR. WEST:  Yes, Your Honor.  Rick Brashear, please.

5                     RICHARD BRASHEAR,

6  having been first duly placed under oath, was examined and

7  testified as follows:

8         THE COURT:  Thank you.

9         Mr. West, you may proceed.

10         MR. WEST:  Thank you, Your Honor.

11                   DIRECT EXAMINATION

12  BY MR. WEST:

13  Q    State your name, please, sir.

14  A    Richard Brashear.

15  Q    You go by "Rick"?

16  A    Yeah, Rick.

17  Q    Rick, how old are you?

18  A    52.

19  Q    How tall are you, Rick?

20  A    Six-four-and-a-half.

21  Q    Rick, where do you live at?

22  A    141 Cobblers Knob Road, Delphia, Kentucky.

23  Q    Where is Cobblers Knob Road?

24  A    It's about a mile from Letcher County line going towards

25  Harlan and Bell County.

RICHARD BRASHEAR – DIRECT – MR. WEST                    3

1  Q    Okay.  Are you in Perry —

2  A    It's in Perry County.

3  Q    In Perry County?

4  A    Yeah.

5  Q    Toward, I guess, the southeast corner of Perry County?

6  A    Yeah.

7  Q    How long does it take to get from here to there?

8  A    About an hour and a half, hour and 45 minutes.

9  Q    Okay.  How long have you lived on Cobblers Knob?

10 A    Three years, going on four years.

11 Q    Okay.  Mr. Brashear, I'll just go right to it.  Have you

12 been convicted of felonies before?

13 A    Yes, sir.

14 Q    Do you know how many you've been convicted of?

15 A    Several, I think.

16 Q    Okay.  Does one of those include a marijuana conviction?

17 A    Yes, sir.

18 Q    Does another one include like a cocaine conviction?

19 A    No.

20 Q    Okay.  How about a possession of controlled substance?

21 A    Yes, sir.

22 Q    Okay.  And then do you have a theft by deception for bad

23 checks, too?

24 A    Yes, sir.

25 Q    Now, you pled guilty in this matter, didn't you?

1   A    Yes, sir.

2   Q    Okay.  Is that a felony you pled guilty to?

3   A    Yes, sir.

4   Q    And you know what the minimum time is you're looking at?

5   A    Yes, sir.

6   Q    What's that?

7   A    Seven years, I think.

8   Q    Okay.  And what does it go all the way up to?

9   A    Life.

10  Q    Okay.  Now, have you entered into a plea agreement with the

11  United States, myself, in this matter?

12  A    A plea agreement?

13  Q    Yeah.

14  A    Yes.

15  Q    Okay.  And what's part of that agreement, to your

16  understanding?

17  A    All of it, I think.

18  Q    Okay.  What are you supposed to do as part of that plea

19  agreement?  Did you agree to cooperate with us?

20  A    Oh, yes, sir.

21  Q    And did you agree to testify?

22  A    Yes, sir.

23  Q    When are you going be sentenced, Rick?

24  A    June the 2nd.

25  Q    Okay.  About ten days, 12 days?

1   A     Yeah, something like that.

2   Q     And where will you be sentenced at?

3   A     Here.

4   Q     Right here in London?

5   A     Yes, sir.

6   Q     For your cooperation, have you been told that we're going

7   to ask the Judge to go downward, give you some consideration on

8   your sentence?

9   A     No.

10  Q     Okay.  Are you expecting any sentence, sir?

11  A     No.

12  Q     Have you been told that your cooperation will be made known

13  to the Judge?

14  A     Yes.

15  Q     Okay.  And that we're going to ask the Court to go down a

16  little bit; do you recall that?

17  A     Yes, sir.

18  Q     All right.  Now, you took an oath when you came in here,

19  correct?

20  A     Yes.

21  Q     And that oath is to do what, Mr. Brashear?

22  A     Tell the truth the best of my knowledge and memory.

23  Q     All right.  Do you know Jeremy Brashear?

24  A     Yes, sir.

25  Q     How do you know him?

1   A    That's my brother's boy.

2   Q    So he's your nephew?

3   A    Yes, sir.

4   Q    Do you know James Bowling?

5   A    No.

6   Q    Okay.  I would ask you to take a look at this individual in

7   the white shirt here.

8   A    Yes, sir.

9   Q    Do you know him?

10  A    Uh-huh.

11  Q    Who's he?

12  A    That's George Clark.

13  Q    All right.  When was the first time that you saw Mr. Clark,

14  Rick?

15  A    When they come to my house.

16  Q    When you say "they," you mean who?

17  A    Him and Jeremy and a little short fellow.  I take it it was

18  that Bowling feller.

19  Q    What did that little short fellow look like?  Could you

20  tell what color hair he had?

21  A    No, I sure don't.  I don't remember.

22  Q    And do you recall about when that was that they came to

23  your house?

24  A    It was in the late summer.

25  Q    2006?

1    A    Yes.

2    Q    Okay.  Would that have been around August 18th of 2006?

3    A    Yeah, that would be about right.

4    Q    Did you know that Jeremy was coming to your house that day?

5    A    No, sir.

6    Q    And who did you stay there with?

7    A    Who do I stay with?  My wife, Sherry.

8    Q    Okay.  Does anybody else stay there with you from time to

9    time?

10   A    She's got a niece that stays there every now and then.

11   Q    And what's her name?

12   A    Melissa.  It was Begley, she got married.  It's Melissa

13   Adams now.

14   Q    Okay.  What time of the day was it when these people first

15   came to your residence, Rick?

16   A    It was in the evening.  It wasn't probably a couple of

17   hours or hour or so before dark.

18   Q    Okay.  And what were you doing at the time they showed up?

19   A    We'd just got home.  We had been to Hazard shopping or

20   something or other, and we just got home and they pulled up.

21   Q    All right.  What did they pull up in, sir?

22   A    A little white Chevrolet Blazer.

23   Q    Okay.  Was anybody else with those three fellows?

24   A    No.

25   Q    What took place next, Rick?

1  A    My nephew come in and proceeded to — Well, first they come

2  in — you want me to tell the truth, right?  They come in, they

3  had a bunch of Xanaxes, so we —

4  Q    I'm sorry.  Who had the Xanaxes?

5  A    My nephew.

6  Q    Jeremy?

7  A    Yeah.  And he kind of passed them out, and we done some of

8  those, and then he told me what they was going to do.

9  Q    Okay.  Jeremy passed out the Xanaxes?

10 A    Yeah.

11 Q    Okay.  Who all took the Xanaxes?

12 A    Me and my wife.

13 Q    Who else?

14 A    I think Jeremy might have done some.

15 Q    Okay.  Anybody else?

16 A    Not that I remember.

17 Q    All right.  And you said Jeremy told you something?

18 A    Yeah, he was telling about that they was robbing people.

19 Q    Okay.  Did he say what kind of people they were robbing?

20 A    Drug dealers.

21 Q    Did he tell you how many times he had robbed them?

22 A    No.

23 Q    Did you see any firearms?

24 A    Yeah, they showed me some guns.

25 Q    What kind of guns did they show you, Rick?

RICHARD BRASHEAR - DIRECT - MR. WEST                9

1   A     It was — they looked like AR-15s.

2   Q     Okay.  What color were they?

3   A     Black.

4   Q     How many?

5   A     Two.

6   Q     And who had them to show them to you?

7   A     Jeremy and Clark there.

8   Q     The defendant here?

9   A     Yes, sir.

10  Q     Okay.

11  A     And the little Bowling feller had like a 9-millimeter

12  pistol.

13  Q     Okay.  What color was the 9-millimeter pistol?

14  A     It wasn't siler, it was regular color.

15  Q     Okay.  When they showed you the AR-15s, were they in a bag,

16  or how did they show them to you?

17  A     They was in cases.

18  Q     What color cases?

19  A     I'm not sure.

20  Q     Mr. Brashear?

21  A     Yes, sir.

22  Q     I'm showing you what's marked as Exhibits 33 and 34.

23  A     Okay.

24  Q     I'm not asking you to handle them, Rick.

25  A     I'm not allowed to touch no weapons.

1    Q    That's right.  You're not allowed to touch those.

2         If you'd take a look at those two items there.

3    A    Yes, sir.

4    Q    How do those compare with the items that you were shown on

5    that day by Mr. Clark and Jeremy Brashear?

6    A    They look almost the same.

7    Q    Same color?

8    A    Yes, sir.

9    Q    Same length?

10   A    Uh-huh.

11        MR. WEST:  Okay.  Thank you, Chris.

12   BY MR. WEST:

13   Q    Did you shoot the AR-15s, Rick?

14   A    No.

15   Q    Did anybody shoot them that day?

16   A    No.

17   Q    Did they show you anything else?

18   A    No.

19   Q    Didn't show you any clothing or anything?

20   A    I don't remember.

21   Q    Okay.  Do you recall how they were dressed, Rick?

22   A    They was dressed in normal clothes.

23   Q    At some point, were you asked if you knew where any drug

24   dealers were located?

25   A    Yes, sir.

1  Q    Okay.  Who asked you that?

2  A    Jeremy, my nephew.

3  Q    All right.  Was anyone else present when that conversation

4  took place?

5  A    Yes, all of us were.

6  Q    All of us.  Does that include the defendant?

7  A    Yes, sir.

8  Q    Okay.  And what did you tell him?

9  A    I knew where one was.

10  Q    Okay.  And what community was that in?

11  A    That was in -- below Hazard in Hardburly, Kentucky.

12  Q    Hardburly?

13  A    Yes, sir.

14  Q    Okay.  And is that still in Perry County?

15  A    Yes, sir.

16  Q    I told you I was going to ask this question.

17  A    Pardon?

18  Q    I told you I was going to ask this next question.  How did

19  you know of this individual's residence?

20  A    That's the guy that -- I showed them where he lived.  He's

21  the one that sold my son drugs and my son overdosed in -- June

22  the 13th of '05.

23  Q    Mr. Brashear, did you give them directions to this

24  location?

25  A    Yes, sir.

1   Q    Okay.  Did you do anything in exchange for this

2   information?

3   A    I got some cigarettes and some gas.

4   Q    Okay.  What kind of vehicle were you driving at the time?

5   A    Gray '90 model Lumina.  Well, my wife was driving it.

6   Q    Your wife was driving it?

7   A    Yes, sir.

8   Q    About how far from your house to this residence in

9   Hardburly was it?

10  A    From my house?

11  Q    Yes, sir.

12  A    About 45 miles, I'd say.  Because it's 35 miles to

13  Hardee's, and I figure it's another probably ten miles on to

14  Hardburly.

15  Q    Hardee's, you mean Hardee's restaurant?

16  A    Yes, sir.

17  Q    Is that there in Hazard?

18  A    It's right at the lights in Hazard.

19  Q    The lights towards the end by the high school?

20  A    Yes, sir.  Right there at Hazard High School, yeah.

21  Q    Okay.  Did you-all stop anywhere on the way?

22  A    On the way?  I think we stopped and got gas and cigarettes.

23  Q    Do you recall where you stopped and got gas and cigarettes?

24  A    At Boone Ledge Mini Mart.  Boone Ledge, like Daniel Boone.

25  Q    Rick, who was in what vehicle when you-all left?

1  A     Me and my wife and my wife's niece, I guess she's my niece,

2  too, and I'm thinking Mr. Clark was with me.

3  Q     Okay.  The defendant, Mr. Clark?

4  A     Yes, sir.

5  Q     Who was in the other vehicle?

6  A     Jeremy and that little short fellow, Bowling.

7  Q     And the other vehicle was what, again, please?

8  A     The white Chevrolet Blazer.

9  Q     Do you know where the AR-15s were at that you saw earlier?

10 A     They were in the Blazer.

11 Q     Rick, could you tell the heights of these individuals, the

12 defendant and Jeremy and James Bowling?

13 A     Like how tall they are?

14 Q     Yes, sir.  Who was the tallest?

15 A     Mr. Clark was the tallest.

16 Q     Who was the shortest?

17 A     That Bowling, little short feller, and then my nephew.

18 Q     Okay.  Could you tell if the short fellow was thin or a

19 little thicker?

20 A     A little chubby feller.

21 Q     Okay.  Now, once you got towards Hardburly, what happened

22 then, Rick?

23 A     At the railroad tracks up in Hardburly, I got out and got

24 in with them, and they drove by this guy's house that sold

25 drugs, and I pointed the house out.

RICHARD BRASHEAR — DIRECT — MR. WEST          14

1  Q     Okay.  Who was in that vehicle when you drove by the guy's

2  house in Hardburly?

3  A     Mr. Clark, Jeremy, and Bowling.  And myself.

4  Q     Let me ask you this, Rick.

5  A     Yes, sir.

6  Q     Do you remember talking to Jeff Baker at some point, Agent

7  Jeff Baker here, after these events took place?

8  A     Yes, sir.

9  Q     And do you recall him interviewing you?

10  A     Uh-huh.

11  Q     Now, do you recall telling him that you drove your own

12  vehicle and that the three suspects drove in an older model

13  white SUV, and that you, your wife Sherry, and Missy drove in

14  the vehicle.  Do you recall telling Jeff that?

15  A     If I told him that, I —

16  Q     Now, when you're going by the residence there in Hardburly,

17  again, tell the jury who was in the white SUV?

18  A     Me and Jeremy and Mr. Clark and Mr. Bowling.

19  Q     Mr. Brashear, look behind you there, if you don't mind.

20  A     Okay.

21  Q     Okay.  In that chart, there's a photograph of a building

22  there at the top.  Do you recognize that building?

23  A     Yes, that's the trailer I showed them where —

24  Q     Okay.  Did you know this fellow's name that lived there?

25  A     All I know, they called him Fred.

RICHARD BRASHEAR - DIRECT - MR. WEST          15

1    Q    Fred?

2    A    Yeah.

3    Q    Did you tell either Jeremy or the defendant or Mr. Bowling

4    what kind of drugs that guy sold?

5    A    Yes, sir.

6    Q    What was that?

7    A    OxyContin.

8    Q    Is that what your son died of?

9    A    Yes, sir.

10   Q    All right.  What happened after you showed them this

11   building there in Hardburly?

12   A    Okay, they come on down this way past it and they turned

13   around and went back out, and I got back out at the railroad

14   tracks and got in my car with my wife and we left.

15   Q    Okay.  With your wife, and what about Ms. Begley?

16   A    Yeah, she was in the back seat.

17   Q    Okay.  And where did you guys go to?

18   A    We was heading home and we stopped at Daniel Boone Mini

19   Mart again, and that's when they caught back up with us.

20   Q    When you said "they "caught back up with you, who caught

21   back up with you?

22   A    Jeremy and Mr. Clark and Mr. Bowling.

23   Q    Okay.  When they left you there at the railroad tracks, how

24   were they dressed?

25   A    They had dressed normal, but they was — they was a putting

RICHARD BRASHEAR - DIRECT - MR. WEST                16

1  black T-shirts and stuff on.

2  Q    Who was putting black T-shirts on?

3  A    The three other guys, Jeremy, Mr. Clark, and Mr. Bowling.

4  Q    Did you see any masks, Rick?

5  A    No, I didn't see no masks.

6  Q    Did you see any firearms at that time?

7  A    Yes, sir.

8  Q    Which firearms?

9  A    The ones in that picture, the ones you showed me there.

10 Q    Okay.  Do you recall who had what gun?

11 A    I think Mr. Bowling still had the 9-millimeter.

12 Q    Okay.

13 A    And Mr. Clark was in the back seat.  I was sitting in the

14 back with Mr. Clark, and he was loading one of the AR-15 or one

15 of those assault-looking rifles.

16 Q    The defendant was loading one of those?

17 A    Yes, sir.

18 Q    Okay.  What was the other guy -- what was your nephew,

19 Jeremy Brashear, doing?

20 A    He was in the front seat.  I was sitting behind him, I

21 couldn't see what he was doing.

22 Q    How long did it take you to get from the railroad tracks to

23 the Boone Ledge Mini Mart?

24 A    Probably 15, 20 minutes.

25 Q    Okay.  Now, how did they catch up with you at the Boone

1  Ledge?

2  A     In that white Blazer.

3  Q     Yeah.  I mean, did they make any — were you guys already

4  pulled over and inside the place?

5  A     Yeah, we was already pulled over at the place, and I was

6  inside.

7  Q     All right.  And when did you first see them while you were

8  in that mini mart?

9  A     When I came back out, they pulled up behind us, or right

10  beside of us kinda.

11  Q     Did you talk with any of the individuals in there?

12  A     Yeah.  They said they wanted to put some stuff in my car.

13  Q     Who said that?

14  A     Jeremy and them.  All of — Well, Jeremy did.

15  Q     All right.  And what did they put in your car?

16  A     Some satchels and stuff.  My wife has got a truck release

17  on the inside, she just popped it and they just throwed it in,

18  and —

19  Q     Okay.  Did you have a destination where you were going to

20  go to?

21  A     We was going home.

22  Q     All right.  And was that still in the white SUV that you

23  talked about before?

24  A     Yes.

25  Q     What happened next, Rick?

1  A    Mr. Clark got in with my niece in the back seat and we

2  proceeded on towards Delphia, Kentucky.  And before you get to

3  Delphia, you have to go to the back of a little place called

4  Viper, it's a little crook in the road.  And they flashed their

5  lights and we pulled off, and Mr. Clark got out with Jeremy, and

6  Jeremy said meet them on top of Hall Mountain.  And Hall

7  Mountain, I used to live on Hall Mountain, so I —

8  Q    Let me stop you just a second, Rick, and go back for just a

9  minute.

10  A    Okay.

11  Q    When you-all left your house to go to Hardburly, was it

12  dark or was it still light?

13  A    It was still light.

14  Q    All right.  When you got to Hardburly, was it dark or

15  light?

16  A    It was still light.  It was getting dusky.

17  Q    Okay, dusky?

18  A    Yeah.

19  Q    When you met up with them at the Boone Ledge, was it dark?

20  A    Yeah, it was dark.

21  Q    All right.  Now, you said the defendant got in the car with

22  you and Sherry and Missy?

23  A    Yes, sir.

24  Q    Was Missy friendly with Mr. Clark?

25  A    Yes, sir.

1  Q    All right.  How far was it from the Boone Ledge to the

2  Viper area that you talked about?

3  A    Probably ten mile.

4  Q    All right.  Which car was leading, your Lumina or the white

5  SUV?

6  A    My Lumina.

7  Q    Okay.  And you said they flashed their lights at you?

8  A    Yes, sir.

9  Q    And then what happened, Rick?

10 A    They pulled over to the side of the road and Jeremy told us

11 to meet them at the top of Hall Mountain.  Mr. Clark got in with

12 Jeremy and Brown in that little Blazer and —

13 Q    How were they dressed when they met up with you at Boone

14 Ledge?

15 A    They was in normal clothes.

16 Q    Okay.  Now, when they left Viper, how were they dressed?

17 A    Normal clothes.

18 Q    They say meet you up on Hall Mountain?

19 A    Yes.

20 Q    Now, how far is Hall Mountain from Viper?

21 A    About three or four mile, something like that, five mile at

22 the most.

23 Q    Did you talk with them about what had to happen at

24 Hardburly after you left?

25 A    No.

1  Q    At that time, did you see anything in the vehicle that may

2  have belonged to somebody else in the white SUV?

3  A    At Viper or --

4  Q    At Viper.  Yes, sir, at Viper.

5  A    No.

6  Q    All right.  Now, how far was it from Viper up to Hall

7  Mountain?

8  A    About three or four mile, three to four mile up there.

9  Q    All right.  Was there a specific place up on Hall Mountain

10 you were supposed to meet them?

11 A    Yeah, right at the crest at the top, there's a cemetery.

12 Q    Okay.  All right.  And who went up to Hall Mountain at

13 first?

14 A    Me and my wife and Missy.

15 Q    Okay.  Do you know Carew Messer?

16 A    Yes, sir.

17 Q    How long have you known Carew Messer?

18 A    Probably ten years, I'd say, or more.

19 Q    Have you ever bought drugs from Carew?

20 A    Yes, sir.

21 Q    How long ago has that been, Rick?

22 A    It's not been long ago.  Well, it's been five years ago.

23 Q    Did you buy any in July or August of 2006 before these

24 events took place from Carew?

25 A    Yes.

RICHARD BRASHEAR – DIRECT – MR. WEST          21

1   Q    Okay.  What did you buy from him?

2   A    His wife got Percocet 10s, and Carew, he got Lorcet 10.  Of

3   course, he bought Xanaxes elsewhere.  We would always go down to

4   work out — you know, we'd work it out or whatever, mow grass.

5   Q    Do you know Louise?

6   A    Yes, his daughter.

7   Q    Did you ever buy any from her?

8   A    No.  She's a good woman.

9   Q    Okay.  Now, how long were you up on Hall Mountain?

10  A    Probably wasn't there 15 minutes, 20 minutes at most.

11  Q    How far is Carew Messer's house from that place there in

12  Viper?

13  A    About a mile.

14  Q    About a mile?

15  A    About a mile.

16  Q    You can get there in less than four or five minutes to

17  Carew's house?

18  A    Yeah, it wouldn't take long at all.

19       MR. WEST:  May I please, sir?

20       THE COURT:  Yes.

21  BY MR. WEST:

22  Q    Rick, do you see that other chart behind you there?

23  A    Yes, sir.

24  Q    Take a look at that building there in the photograph at the

25  top.  Do you know whose house that is?

1  A    That's Carew and Pauline Tracy's house.

2  Q    Okay.  Have you been there?

3  A    Yes, sir.

4  Q    How many times?

5  A    Hundreds.

6  Q    When you were up on Hall Mountain, I'm going to assume it

7  was still dark?

8  A    Yes, sir.

9  Q    All right.  What happened after you guys were up there for

10 a little bit you talked about?

11 A    We waited on them to get up there, and when they got up

12 there, they was rummaging through the stuff and got to looking,

13 and they had — I seen — noticed pill bottles and stuff, heart

14 medications and diabetes medicine and stuff, and they had Carew

15 and Pauline Tracy's name on it.

16 Q    Had you seen those before that moment there on Hall

17 Mountain?

18 A    No.

19 Q    Had you seen them at your house there in Cobblers Knob?

20 A    No.

21 Q    Had you seen them at the railroad tracks near Hardburly?

22 A    No.

23 Q    Had you seen them in Viper at the post office there?

24 A    No.

25 Q    Is that the first time you saw those?

RICHARD BRASHEAR - DIRECT - MR. WEST          23

1    A    That's the first time I saw them.

2    Q    How did you feel about that, Rick?

3    A    It upset me.

4    Q    Why?

5    A    Because we had done a lot of work and helped Pauline and

6    Carew out because they had been sickly and stuff, and we were

7    just real good friends with them.

8    Q    All right.  When they got back -- Well, let me back up to

9    Viper there.  You said that when you were at Boone Ledge they

10   threw these items in the back of your car, correct?

11   A    Uh-huh.

12   Q    Now, when you were at Viper, were these -- first pulled up

13   at Viper, were those items still in the back of your car?

14   A    Yes, sir.

15   Q    All right.  Did anything happen to those while you were at

16   Viper?

17   A    They got them out.

18   Q    Okay.  When you say "they," you mean who, sir?

19   A    Jeremy and Mr. Clark and Mr. Bowling.

20   Q    All right.  And did they open the bags in front of you?

21   A    No.

22   Q    Did they leave Viper before you left, or did you leave

23   before they did?

24   A    I left before they did.

25   Q    All right.  So you don't know what happened after you left

1   there?

2   A     No.

3   Q     When you got on Hall Mountain there, you said they were not

4   there yet, correct?

5   A     No, they wasn't there.

6   Q     All right.  Now, what happened when they first pulled up?

7   How were they dressed?

8   A     They was in their normal clothing.

9   Q     Okay.  Did you see the bag again?

10  A     Yeah.

11  Q     All right.  What happened to the bag?

12  A     It was in that Blazer.

13  Q     Okay.  What happened to it after that, sir?

14  A     Oh, they put it back in my car again.

15  Q     Okay.  Who is "they" put it in the back of your car?

16  A     Jeremy and Mr. Clark and Mr. Bowling.

17  Q     When they got up to Hall Mountain, I'm not talking about

18  the bag, but did you look inside the SUV there at all?

19  A     Yes.

20  Q     Did you see the AR-15s?

21  A     Yes.

22  Q     Okay.  What happened to those?

23  A     They put them in the back of my car, too, also.

24  Q     After you saw these pill bottles that had Pauline Tracy's

25  name on them and Carew Messer's on them, what did you say to

1  these guys?

2  A    I asked Jeremy, I said, "Why did you-all mess was them old

3  people for?  It's stupid."

4  Q    What happened after that, Rick?

5  A    Then we left.

6  Q    Who was in the Lumina that you had?

7  A    Me and my wife and Missy and Mr. Clark.

8  Q    Okay.  Where did you guys go to?

9  A    To my home.

10  Q    All right.  And who was in the white SUV?

11  A    Jeremy and Mr. Bowling.

12  Q    Did you — if you had to go up to Hall Mountain, do you get

13  to go back down or go over to the other side?

14  A    Go over the other side and hit Route 7.

15  Q    Okay.  Did both of you guys go to the other side?

16  A    Yes, sir.

17  Q    Who was in front?

18  A    I was.  Well, my wife — we were.

19  Q    You were?

20  A    My wife, yeah.

21  Q    What happened next?

22  A    We went up Route 7 and from Route 7 you get on 699, and as

23  we turned on 699, we seen the county police sitting there at

24  Roark's BP.

25  Q    Right.

1   A    And we went on, and the white Blazer had a headlight out,

2   and they got stopped.  And we never seen them no more.

3   Q    The county vehicle got stopped?

4   A    Yeah.

5   Q    All right.

6   A    And the white Blazer.

7   Q    And Mr. Clark is with you, correct?

8   A    Yes, sir.

9   Q    And the AR–15s are in your vehicle.

10  A    Yes, sir.

11  Q    What did Mr. Clark say when that vehicle got pulled over?

12  A    I don't remember.

13  Q    All right.  How far from where they got pulled over was it

14  to your residence there at Cobblers Knob?

15  A    About eight or nine miles, I guess.

16  Q    What happened when you got to your residence?

17  A    Mr. Clark took the stuff out behind my home and put it in

18  the weeds.

19  Q    What stuff was that, Rick?

20  A    The black bags and guns.

21  Q    Okay.  And I'm assuming it was dark when you got back to

22  your residence?

23  A    Yes, sir.

24  Q    What happened next?

25  A    We went in the house, and my niece stayed all night with

1  Mr. Clark.

2  Q    Okay.  Mr. Clark stayed in your home?

3  A    Yes, sir.

4  Q    What happened the next morning?

5  A    He got up and called his wife to come and get him.

6  Q    You mean the defendant got up and called his wife to come

7  and get him?

8  A    Yes, sir.

9  Q    All right.  Did a person come to your home?

10 A    No — well, I took Mr. Clark and his stuff down to The

11 Front Porch, which is four miles below my home at an

12 intersection of 463 and 699, and we met up with his wife and

13 some other woman.

14 Q    Okay.  You said "The Front Porch."  Is that the name of a

15 store?

16 A    Yes, sir.

17 Q    All right.  Now, you had said just a moment ago that

18 Mr. Clark put those items and the guns in the weeds when you-all

19 first got there, correct?

20 A    Yes.

21 Q    Did you say anything to him about that the next day?

22 A    I wanted the stuff gone from my place.

23 Q    All right.  And did he do that?

24 A    Yes, sir.

25 Q    Where did he put them?

RICHARD BRASHEAR – DIRECT – MR. WEST          28

1   A    I think his wife and some other girl pulled up and they

2   loaded stuff.  I know I said that we took it down the road, but

3   I'm not sure.

4   Q    You're not sure if you took him to The Front Porch?

5   A    Yeah, I'm not sure.  I don't think ––

6   Q    Let me ask you this:  You recall talking to Agent Baker

7   again, correct?

8   A    Yes, sir.

9   Q    All right.  Did you tell him that after you dropped the

10  tall suspect off, you returned to your residence and observed

11  that the tall suspect had left the firearms in the weeds behind

12  your house?

13  A    Uh-huh.  That's what I told him.  That's what it was.

14  Q    Okay.  Do you remember that now?

15  A    Yes, sir.

16  Q    All right.  Now, what happens after –– did you leave the

17  defendant there at The Front Porch with the two women?

18  A    Yeah, he got in with them and they come back up to my house

19  and ––

20  Q    All right.  Then what happens when they got to the house?

21  A    They got the stuff loaded up and left and I never seen them

22  no more.

23  Q    Okay.  Did you see what was in the case, or the stuff there

24  that he got out of the weeks?

25  A    No, I didn't look.

RICHARD BRASHEAR - DIRECT - MR. WEST          29

1  Q    Mr. Brashear, Jeremy Brashear, James Bowling, and the

2  defendant, which one of those guys was the tallest guy?

3  A    Mr. Clark.

4  Q    When you met with Agent Baker, did he show you a series of

5  photographs?

6  A    Yeah, had six photographs on it.

7  Q    Mr. Brashear, you're being shown what's marked as

8  Exhibit 19.  Got your glasses there?

9  A    Okay.

10 Q    Do you recall being shown that exhibit by Agent Baker?

11 A    Yep.

12 Q    Were you asked to identify any suspects in there?

13 A    Yes, sir.

14 Q    Which one did you identify?

15 A    Mr. Clark.

16 Q    And what number is that?

17 A    No. 2.

18 Q    Would you hold it up for the jury, please?

19 A    (Witness complies with request of counsel.)

20 Q    Thank you, Rick.

21 A    Okay.

22 Q    Mr. Brashear, after the defendant left your residence that

23 morning with that stuff that you talked about, have you seen him

24 since before coming into court today?

25 A    No, sir.

1          MR. WEST:  That's all of this witness, Your Honor.

2          THE COURT:  Thank you.

3          MR. HOSKINS:  Can we approach?

4          THE COURT:  Yes, sir, you may approach.

5     (Whereupon, the following discussion was had between the

6     Court and counsel at the bench, out of the hearing of the jury.)

7          MR. HOSKINS:  Your Honor, I'd ask for a few minutes to

8     review the presentence report materials and the NCIC that I have

9     been given for Mr. Brashear.

10          THE COURT:  We're about to take our first afternoon

11     break.  We'll take — Will 20 minutes be enough?

12          MR. HOSKINS:  That will be fine, sir.

13          MR. WEST:  Just for Mr. Hoskins' purposes and for the

14     Court to be clear, I provided to him the criminal history in the

15     PSR which I believe to be the most accurate of the NCICs and

16     AOCs.  So it's all listed there.  There's nothing outside — if

17     the probation office couldn't find it, then it doesn't exist.

18          THE COURT:  We'll give you as much time as you need.

19     If you need more time, just let me know before the jury is

20     brought in.  I'm going to give them until ten till 3:00 for

21     their break.  If you need more time than that, you can just

22     alert the CSO before we bring the jury back in.

23          MR. HOSKINS:  Yes, sir.

24     (Whereupon, the following proceedings continued in open

25     court.)

1           THE COURT:  Thank you.  Ladies and gentlemen of the

2     jury, we're going to take our evening break at this time before

3     we continue with examination of the witnesses.  Please keep in

4     mind the admonition that I have given to you previously.  Don't

5     discuss the case among yourselves while we're in recess.  We'll

6     take a 20-minute recess until ten minutes till 3:00 this

7     afternoon, and the jury will be excused until that time.

8           (Whereupon, the jury retired from the courtroom, after

9     which the following proceedings were had in open court.)

10          THE COURT:  Counsel, any matters to take up outside

11    the presence of the jury?

12          MR. WEST:  No, sir.

13          MR. HOSKINS:  No, Your Honor.

14          THE COURT:  We'll be in recess for 20 minutes.

15          (Whereupon, a short recess was had, after which the jury

16    returned to the courtroom and the following proceedings were had

17    in open court.)

18          THE COURT:  Thank you.

19          The record will reflect all members of the jury are

20    present.  The defendant and counsel are also present.

21          Let's see, if the witness could return to the witness

22    stand.

23          Thank you.  Before you proceed with your

24    cross-examination, let me remind the witness that he is still

25    under oath.

1              You may proceed.

2              MR. HOSKINS:  Thank you, Your Honor.

3                        CROSS-EXAMINATION

4   BY MR. HOSKINS:

5   Q    Mr. Brashear, you talked to the police on August the 23rd

6   of 2006, didn't you, Detective Couch and Detective Fugate came

7   to you?  Just a —

8   A    I'm not sure.

9   Q    Do you remember those two detectives coming to talk to you

10  just a few days after what you've just told us about?

11  A    They come to my house?

12  Q    Well, they talked to you — Yeah, they said they came to

13  your house.

14  A    I seen Chris Fugate was there, yeah.

15  Q    I'm sorry?

16  A    Chris Fugate come to my house.

17  Q    And Detective Couch?

18  A    Yes, sir.

19  Q    They asked you about being involved with this stuff?

20  A    I'm not sure.  Well, I — yeah.  Okay, I'll say yes.

21  Q    Well, now, do you remember or not?

22  A    I don't remember.

23  Q    Okay.  I'm going to ask you about what you really remember.

24  You've already told us that you used some drugs that day, some

25  Xanax.

1  A    Uh-huh.

2  Q    And you've told us that you bought drugs at Carew Messer's

3  house --

4  A    Yes, sir.

5  Q    -- many times?  You've used a lot of drugs in your time,

6  haven't you?

7  A    Not a whole lot.

8  Q    What kind of drugs have you used?

9  A    I've tried I guess everything except heroin.

10 Q    Everything except heroin?

11 A    Yes, sir.

12 Q    So all those drugs that you used, have they had any impact

13 on your thinking?

14 A    No.

15 Q    Any impact on your memory?

16 A    No.

17 Q    Then what is it that's keeping you from remembering whether

18 or not Detective Fugate asked you about this case?

19 A    It's been almost three years ago.

20 Q    So it's just that it's been some time passed?

21 A    Yeah.

22 Q    You remember him coming to your house but you don't

23 remember why?

24 A    No.

25 Q    Okay.  Do you remember Detective Baker or Agent Baker

1  coming to your house or coming to talk to you at some point?

2  A    The first time I talked to him?

3  Q    Do you remember more than once?

4  A    First and only time —— the first time I talked to him was

5  at Carew Messer's house.

6  Q    Okay.  At Carew Messer's house?

7  A    Yes, sir.

8  Q    Agent Baker talked to you there?

9  A    Yes, sir.

10 Q    And did you talk to him another time after that?

11 A    I'm not sure.

12 Q    Don't remember whether you did or not?

13 A    Don't remember.

14 Q    Okay.  But you do remember talking to him at Mr. Messer's

15 house?

16 A    Yes, sir.

17 Q    And that was Pauline Tracy's house?

18 A    Yeah, she just had passed away.

19 Q    Okay.  You told him that day when you saw those pictures

20 that you were maybe 80 percent sure that that was George Clark

21 in that —— when you made that identification of that picture; is

22 that right?

23 A    I don't know if I said that or not.

24 Q    Don't remember?

25 A    I don't remember.

1    Q    If Agent Baker wrote it up that way, you wouldn't dispute

2    it, though, would you?

3    A    No, sir.

4    Q    Now, you told us a couple of different things about what

5    happened the next morning with some guns that you've talked

6    about.

7    A    Uh-huh.

8    Q    The first time you told it, you told us that you helped

9    load those things up and you took George Clark to that store

10   where the two women picked him up.  You told us that just a

11   little while ago, didn't you?

12   A    I probably did.

13   Q    Do you remember that?

14   A    Yeah, I remember talking.

15   Q    Okay.  And then Mr. West said, well, now, wait a minute, do

16   you remember telling it some other way?  And you said, "Oh,

17   yeah, that's what I said."  Do you remember that, or are you

18   just trying to make Mr. West happy?

19   A    No.

20   Q    You don't remember it?

21   A    No, I'm not trying to make nobody happy.  I'm just trying

22   to tell the truth the best of my knowledge.

23   Q    Do you remember it at all, what happened that next day?

24   A    Yeah.

25   Q    Do you remember telling Agent Baker when he came to talk to

 1  you that it was later on that day that George Clark called you

 2  on the phone and showed up in a fancy green car to get those

 3  guns?  Do you remember that?

 4  A    I don't remember him calling me on the phone, but whatever

 5  I've told Agent Baker was the truth.

 6  Q    What if it's different from what you've told us just now?

 7  A    It's been over two years ago.  I don't remember what

 8  happened two or three years ago.

 9  Q    Okay.  So you don't remember what happened.  As you sit

10  here today, you don't remember what happened?

11  A    Yes, I do remember what happened.

12  Q    Okay.  Mr. Brashear?

13  A    Uh-huh.

14  Q    When you got involved with this stuff that you've talked

15  about, you were on probation at that time, weren't you?

16  A    Yes, sir.

17  Q    For state court charges, and Mr. West asked you about a

18  theft charge for cold checks.

19  A    Yes, sir.

20  Q    From Franklin County?

21  A    Yes, sir.

22  Q    Was that cold checks, or was that something else?

23  A    You want me to explain what it was?

24  Q    Yes, please.

25  A    I was married to my second wife for 17 years, and in 1995

1   she contracted colon cancer and passed away.  And as long as I

2   stayed unmarried or didn't remarry, I would draw teacher's

3   retirement.  Well, I went ahead and got remarried, and every

4   year they signed — send the paper for you to sign that you're

5   not remarried, and I done that for three years and I got caught

6   up in it.  So I'm paying restitution back to it still.

7   Q    So every year you signed a paper that said, no, I've not

8   remarried so that you could keep getting that money?

9   A    Yes, sir.

10  Q    So you were willing to tell that lie to get money?

11  A    That's what I done, yeah.

12  Q    Okay.  Now, you're fixing pretty soon to find out how long

13  a time you're going to go to prison —

14  A    Yeah.

15  Q    — in this case?

16       And you signed a plea agreement, you had a lawyer represent

17  you in that case?

18  A    Yes, sir.

19  Q    And you remember signing a plea agreement?

20  A    Yeah.

21  Q    Your lawyer signed it?

22  A    Uh-huh.

23  Q    Mr. West signed it on behalf of the government?

24  A    Uh-huh.

25  Q    And it was presented to the Judge?

1  A     Uh-huh.

2  Q     And you pled guilty?

3  A     Yes.

4  Q     And you know that you're looking at a minimum of seven

5  years in prison?

6  A     Yes, sir.

7  Q     A maximum of life in prison?

8  A     Yes, sir.

9  Q     You're hoping for a short period of time in prison, aren't

10 you?

11 A     It would be nice.  But if it's seven years, it's seven

12 years.

13 Q     You know that your plea agreement says that if you provide

14 substantial assistance that the United States will file a motion

15 for a downward departure to sentence you to lesser time.  That's

16 part of your written signed plea agreement?

17 A     Okay.

18 Q     Well, do you remember that?

19 A     I've read it, I don't --

20 Q     You understand that to be the truth?

21 A     Yeah, I guess.  If they wrote it, that's what it is.

22 Q     And you understand that it also says the determination as

23 to whether or not you provided substantial assistance is solely

24 within the discretion of the United States, right?

25 A     Right.

1   Q    And that's Mr. West who is representing the United States

2   in this case?

3   A    Uh-huh.

4   Q    So you want to please him, don't you?  You want him to make

5   that motion, don't you?

6   A    All I'm trying to do is tell the truth the best of my

7   knowledge.

8   Q    And you want Mr. West to make that motion, don't you?

9   A    It don't matter.

10  Q    Do you want him to ask the Judge to lower your sentence?

11  A    No.

12  Q    You don't want him to do that for you?

13  A    No.

14  Q    You're happy with the seven years?

15  A    That's what -- I made a mistake, I'm willing to take the

16  seven.

17  Q    Okay.  And you wouldn't testify falsely to get a better

18  deal, would you?

19  A    No.  That would just make it worse.

20  Q    When was the last time that you used drugs?

21  A    When they arrested me down here and the Judge sentenced me

22  to -- I've been to rehab and stuff and done great since then.

23  Q    Right up to the time that you got arrested, though, you

24  were using drugs?

25  A    When?

1  Q    Right up until the time you got arrested?

2  A    Which time?

3  Q    Well, I don't know.

4  A    Oh, when it was for this, yeah.

5  Q    The State of Kentucky has filed a motion to revoke your

6  probation in that case, haven't they?

7  A    No.  On which case?

8  Q    On either the theft case where you ––

9  A    Okay.  On the theft case, yes, they did –– I went to jail

10  for that for 12 days, and I went before a judge and they reduced

11  the amount of money I pay back.  Where I'm disabled, I can't ––

12  I only draw so much money, so they lowered the payments, and I'm

13  making –– still making payments.

14  Q    Okay.  So you've not finished paying that back, but they

15  filed a motion to revoke it?

16  A    Yes, and they reduced it, and I'm back out.

17  Q    And you were also on probation out of Perry County for

18  possession of drugs when all this stuff happened, weren't you?

19  A    I'm not sure.

20  Q    Do you remember going to court in Perry County?

21  A    It's been a while since I've been to court in Perry County.

22  It seems like the last one may have been a PI charge.

23  Q    Well, was there a time on December 3rd of 2001 that you

24  went in and got five years in prison suspended for five years?

25  A    Probably.  If it says that, I did.

1  Q    Do you remember that?

2  A    Yeah.

3  Q    Okay.  So that five years hasn't run up when you did all

4  this stuff with Jeremy and James Bowling, had it?

5  A    Probably not.

6            MR. HOSKINS:  That's all.

7            THE COURT:  Thank you, Mr. Hoskins.

8            Mr. West, any follow-up of this witness?

9            MR. WEST:  Yes, Your Honor.

10                     REDIRECT EXAMINATION

11 BY MR. WEST:

12 Q    Mr. Brashear?

13 A    Yes.

14 Q    Mr. Hoskins asked you some questions about the statement

15 you made to Agent Baker.

16 A    Uh-huh.

17 Q    Okay.  I'm going to show you this document.  It's called

18 Report No. 24 at the top right-hand portion.  I've put like

19 brackets around paragraphs 17 and 18, a little star up on the

20 right-hand side.

21 A    Okay.

22 Q    I want you to read those to yourself first, all right?

23 A    (Witness complies with request of counsel.)

24 Q    Have you got those read?

25 A    Yes, sir.

RICHARD BRASHEAR — REDIRECT — MR. WEST          42

1   Q    Sir, does that refresh your recollection or refresh your

2   memory as to what you told Agent Baker?

3   A    Yeah, that's what I told him.

4   Q    Is that accurate, sir?

5   A    Yes, sir.

6   Q    All right.  Now, read that for the jury on paragraph 17,

7   please.

8   A    It says, "Brashear advised that after he dropped the tall

9   suspect off he returned to his residence and observed that the

10  tall suspect had left firearms in the weeds behind his

11  residence.  Brashear advised that the tall suspect called him

12  later in that day and that he wanted to retrieve the firearms.

13  Brashear advised that he told the tall suspect to come and get

14  them."

15  Q    All right.  Read paragraph 18.

16  A    "Brashear advised that the tall suspect arrived at his

17  residence later that same day.  He advised that the tall suspect

18  was in the same" —— "with the same two women but he was in a

19  different vehicle.  He advised that the tall suspect's vehicle

20  was fancy and that he thought it was green."

21  Q    Okay.  Is that what happened, Mr. Brashear?

22  A    Yes, sir.

23  Q    Now, were you told, either by myself or Mr. Baker, what

24  would happen if you testified falsely or you lied during the

25  course of your testimony to this jury?

1    A    Yes, sir.

2    Q    What did we tell you?

3    A    That it's perjury.

4    Q    What's perjury?

5    A    It's lying on the witness —— on the stand.

6    Q    Okay.  And what did we tell you would happen —— what did we

7    tell you about your testimony?

8    A    To tell the truth, and as soon as I —— I don't —— I don't

9    remember.

10   Q    Okay.  Did we tell you to tell the truth?

11   A    Yeah, I'm supposed to tell the truth, and that's what I'm

12   trying to do.

13   Q    Now, on your sentencing day, which is —— I think 12 days is

14   what we talked about, what's going to happen on that day?  Are

15   you going to jail that day?

16   A    Yes, sir.

17   Q    Okay.  Anybody promise you how long you're going to jail

18   for?

19   A    No.

20             MR. WEST:  That's all of this witness, Your Honor.

21             THE COURT:  Mr. Hoskins, any recross?

22             MR. HOSKINS:  Just a couple.

23             THE COURT:  Yes, sir.

24                          RECROSS—EXAMINATION

25   BY MR HOSKINS:

1   Q    So, Mr. Brashear, you don't know what you're going to get

2   yet?

3   A    No.

4   Q    You'll find out in 12 days?

5   A    Yes.

6   Q    And you know it partly depends on what you do in court here

7   today, don't you?

8   A    Yeah.

9   Q    Okay.  Now, you just read that report to us, and you said,

10  now, that's what the truth was?

11  A    Yeah.

12  Q    Now, is that your final answer on that?

13  A    Yeah.

14  Q    But that's different than the two other things you told us

15  just earlier today, isn't it?

16  A    Yeah.

17  Q    Now, do you really remember what happened?

18  A    At the time I told Sergeant -- or Baker there, whatever I

19  told him was the truth.

20  Q    Do you even remember, right now, sitting there, what the

21  truth is?

22  A    Yeah.

23          MR. HOSKINS:  That's all.

24          THE COURT:  Mr. West, anything else?

25          MR. WEST:  No other questions, sir.

1        THE COURT:  Thank you.

2            Mr. Brashear, you may step down, sir.  Thank you.

3                            (Proceedings concluded at 3:17

4    p.m.)

5                    C E R T I F I C A T E

6        I, Cynthia A. Oakes, certify that the foregoing is a

7    correct transcript from the record of proceedings in the

8    above-entitled matter.

9

10   5/26/2008                    s/CYNTHIA A. OAKES
         DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR
11

12

13

14                        I N D E X

15                                           PAGE

16   Testimony of RICHARD BRASHEAR:
         Direct Examination by Mr. West:           2
17       Cross-Examination by Mr. Hoskins:        32
         Redirect Examination by Mr. West:        41
18       Recross-Examination by Mr. Hoskins:      43

19

20

21

22

23

24

25